Filed 12/4/24  P. v. Lopez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JUAN PABLO LOPEZ,<br><br>     Defendant and Appellant. | A166940<br><br>(San Mateo County Super. Ct.<br>  No. NF433910A) |

Defendant Juan Pablo Lopez, a former San Mateo County deputy sheriff, moved to quash a search warrant seeking his personal cell phone records.  After the trial court denied his motion, a jury convicted Lopez of theft by false pretenses, two counts of mortgage fraud, and conspiracy to commit a computer crime.  On appeal, Lopez contends the court erred in denying his motion to quash the search warrant.  He argues that:  (1) the search warrant is defective because it is based upon an affidavit that failed to present facts showing probable cause, and (2) the *United States v. Leon* (1984) 468 U.S. 897 (*Leon*) good faith exception to the exclusionary rule is inapplicable because the police did not act with objective reasonable reliance on the invalid search warrant.  Lopez further asserts that all of the evidence acquired pursuant to a subsequent search warrant should be excluded as "fruit of the poisonous tree."  We conclude the original search warrant was

1

supported by probable cause. In any event, the *Leon* good faith exception applies. We therefore affirm.

# BACKGROUND

### A. *The April 2014 Search Warrant*

Detective Andrew Armando of the San Mateo County Sheriff's Office authored a 15-page affidavit in support of the challenged search warrant on April 25, 2014.

On the morning of December 1, 2013, contraband—an unauthorized cell phone (hereafter jail phone) and narcotics—was found in cell No. 38 in pod 5 West at the San Mateo County jail. Hours later, the jail phone received a call made from a San Mateo County phone line located at 1050 Mission Road in South San Francisco (San Mateo County Superior Court – Northern), also known as the Northern Court. The jail phone was passcode protected. Additionally, the jail phone had no identifying information: the "Samsung identification sticker" had been removed and the SIM card information had been "scratched off." Based on these alterations, Detective Armando believed "it was clear . . . that the owner/possessor of the phone went through great lengths to conceal the ownership information" relating to the jail phone.

Detective Armando's application sought judicial authority to search Lopez's personal cell phone records, stored voicemail messages, text messages, stored email content, and all geographical location information between the dates of August 17, 2013 and April 24, 2014. Detective Armando represented these records would "either place Juan Lopez within the proximity of 1050 Mission Road" on December 1, 2013, "or help exclude him from involvement in this criminal investigation."

According to the search warrant affidavit, Detective Armando received a call from Detective Hector Acosta, one of the officers investigating the

2

contraband, who stated the jail phone was found in an undamaged ceiling light fixture in cell No. 38. Detective Armando noted the light fixtures in the cells are "enclosed with a secure screen and only a screwdriver with a ' "star shaped" ' bit could open or close" the fixture. The screwdriver was not found in the cell or in possession of the inmates occupying the cell: Dionicio Lopez[1] and David Serrano. Both inmates disclaimed any knowledge about the jail phone and the narcotics.

Detective Armando reviewed a report from Detective Acosta, who interviewed Correctional Officer Del Carlo on December 2, 2013, as part of the contraband investigation. Officer Del Carlo had been assigned to work in housing unit 5 West on November 8, 2013. Del Carlo admitted that Dionicio, who had previously told him about the jail phone, gave Del Carlo the jail phone to hide in mid-November. When Del Carlo had asked Dionicio how he obtained the phone, Dionicio replied, " 'Money talks.' " Del Carlo said Dionicio "told him that he had two people that were helping him get contraband." Del Carlo admitted he knew about the jail phone on November 8 and helped Dionicio conceal it. Del Carlo later "came up" with a plan with Correctional Officers Bleeker and Verber for them to "discover" the jail phone on December 1, so that Del Carlo would not appear to be involved. Del Carlo was "adamant" that he did not initially bring the phone into the jail.

Detective Armando reviewed a supplemental report from Detective Acosta, which stated that on January 7, 2014, Dionicio asked Detective Acosta to join him in the visiting room. Dionicio told Detective Acosta that once he got out of jail, his attorney would tell him everything about the jail

---

[1] Appellant Lopez and Dionicio Lopez are not related; to avoid confusion we refer to Dionicio Lopez by his first name.

3

phone.  As they were talking, Dionicio's parents arrived.  Detective Acosta recorded the conversation between Dionicio and his parents.  Dionicio's mother wanted to know if "they" were treating him well; he answered, "some of them do."  Dionicio told his mother that Detective Acosta wanted "some valuable information."  Dionicio's mother asked him if he "pissed them off."  Dionicio responded, " 'The one that's not there anymore?' "  Dionicio's mother said, " 'And the other one.' "  When Dionicio asked his mother how she knew, she said, " 'It's apparent.' "  Dionicio then asked his mother what " 'they're saying about the guy that's not there anymore, working on the other side.' "  Dionicio's mother told Dionicio to stop talking.

After reviewing the conversation between Dionicio and his mother, Detective Armando "came to the conclusion" that " 'the one that's not there anymore' " was referring to Officer Del Carlo who had been placed on administrative leave after the discovery of the jail phone.  Detective Armando further concluded that the statement about " ' the guy . . . that's working on the other side' " appeared to be a reference to Deputy Juan Lopez, who had been assigned to Dionicio's housing unit until November 11, 2013, when he was "moved to the jail lobby"; he was then "transferred to court security" on January 5, 2014, two days before the recorded visit between Dionicio and his mother.  Detective Armando represented that "working on the other side" was a reference to the court security unit which was "located directly across the street from the jail."

On April 8, 2014, Detective Armando received a copy of an outgoing letter from Dionicio, in which he wrote, " 'as far as the cell phone goes or <u>alleged</u> cell phone lol. . . .  [I]f it is true they found it in my room then im famous in here because its never been done. . . .  Unless I tell them how this

4

alleged cell got in here whitch [*sic*] they think it was a cop, then they are keeping me in the hole.' "

Detectives Armando and Acosta spoke about the letter and agreed they "had never told Dionicio" that they thought "the phone was brought into the facility by a 'cop.' " Detective Armando added, "Based on these two references Dionicio appears to be talking about a cop and Juan Lopez who had been transferred to court security."

Detective Armando described another investigation regarding Jaime Rodriguez, a prior inmate who had been housed in cell No. 38 between June 17, 2013 and November 18, 2013. Records from the jail phone reflected numerous calls and texts to a number later determined to be associated with Rodriguez's girlfriend, Stephanie Torres. After obtaining Torres's cell phone records, Detective Armando found two text messages between Torres's cell phone and an unknown number on November 28, 2013. The first one was an incoming message to Torres's phone that said: " 'Juan is in rwc hel pik uvup on the way bak he said.' " The second message was an outgoing message from Torres's phone that said: " 'Juan said if he could go now? Or should I tell him to wait.' " Detective Armando found no other "Juan" references in the other 129 pages of Torres's records.

Detective Armando further stated that on December 1, 2013, at 5:55 p.m., he observed an incoming call to the already-seized jail phone. Phone records revealed the number belonged to "a trunked phone line" associated with the Northern Court located at 1050 Mission Road in South San Francisco.[2]

---

[2] As part of his investigation, Detective Armando represented he also called the jail phone twice.

On April 3, 2013, Detective Armando obtained the card key access records for the Northern Court from December 1, 2013, and learned there had been no card key access between 2:00 p.m. and 5:55 p.m.—the time of the phone call from the trunked line to the jail phone. Based on his training and experience working court security for the San Mateo County Sheriff's Office, Detective Armando knew there is a single door on the north side of the building that only sheriff's office sworn staff (deputies, sergeants, and command staff) can enter with a key. Security video cameras cover this entry point and the interior of the building. On April 22, 2014, Detective Armando authored a search warrant to obtain all security footage for December 1, 2013, between the hours of 8:00 a.m. and 8:00 p.m.[3]

Detective Armando represented that the search warrant target phone number belonged to Lopez. He reported an electronic search revealed that the target number "belongs to the AT&T network," and the caller ID information listed "Juan Lopez" as the associated person. Detective Armando averred that "cell tower information" related to December 1, 2013 would "either place Deputy Juan Lopez at 1050 Mission Road during the time the call was placed to the jail cellular telephone or potentially exclude him as a co-conspirator." Detective Armando further said he "kn[e]w that a comparison of Deputy Juan Lopez's cell phone call detail records will either show common calls between him and the cellular telephone which was located in the jail or show no common call history which would also potentially exclude him."

---

[3] Although the warrant for the security video was served on the custodian of records on April 23, 2014, the record does not indicate whether the surveillance footage was ever obtained.

6

Detective Armando concluded: "Based on this investigation, I know that Dionicio . . . obtained one or more cellular telephones during his stay in the Maguire Correctional Facility. I know that Dionicio . . . said to Correctional Officer Del Carlo that 'money talks' and that is how he could get things into the jail. In Dionicio's letter that was copied by C/O Santiago, Dionicio . . . references that detectives feel that a 'cop' is involved. In Stephanie Torres'[s] two text messages the name 'Juan' is suspicious because it is clear that both parties know who 'Juan' is but are not messaging him directly. [¶] Further, the conversation between Dionicio Lopez's mother and Dionicio, even in code, appears to be discussing both Juan Lopez and Michael Del Carlo. Further, Del Carlo in his interview with Detective Acosta . . . said that there were two people involved in bringing narcotics and the cell phone into the facility. [¶] . . . [¶] I further know that a call was placed to [the jail] cellular telephone on the day it had been located by law enforcement, from a county line which could only be accessed through a Sworn Sheriff's Office entry point (Northern Court transportation door) with a San Mateo County Sheriff's Office Key."

## B. *The July 2014 Search Warrant*

Inspector Jordan Boyd of the San Mateo County District Attorney's Office authored a 21-page affidavit on July 8, 2014.

Inspector Boyd averred that between October 13, 2013, and continuing through June 3, 2014, Lopez committed: (1) false declaration of candidacy; (2) fraudulent voting; (3) perjury by declaration; (4) conspiracy; (5) theft by false pretenses; and (6) commercial burglary. In connection with these offenses, Inspector Boyd sought judicial authority to obtain the records from the following entities: (1) San Mateo County Registration & Elections

Division; (2) Metropolitan Transportation Commission; (3) Yahoo!; (4) Apple, Inc.; (5) AT&T Wireless; and (6) PayPal.

Through his own investigation, speaking with other investigators, and reviewing police reports, Inspector Boyd learned that on December 1, 2013, Detective Armando began investigating a cell phone that was found in the possession of an inmate at the county jail. Detective Armando and other detectives "conducted extensive interviews with civilians, inmates, and correctional staff members and executed five (5) search warrants" to further the investigation. In his April 14, 2014 affidavit, Detective Armando requested a search warrant to seize and examine "approximately 8-months of historical call detail records" for Lopez's personal cell phone. Inspector Boyd examined Lopez's cell phone records, which listed an address in Newark, California and referenced a Yahoo! email account. From his call detail analysis, Inspector Boyd concluded "the majority of Lopez's cell phone activity, over an 8-month period, indicates Lopez was living in Newark (Alameda County) and not Redwood City (San Mateo County)."

Inspector Boyd believed Lopez, who was then seeking to be elected sheriff in San Mateo County, was ineligible to run based on his residency in Alameda County. He further opined Lopez's "filing of candidacy papers to run was illegal," as was the creation of a PayPal account "to solicit contributions for his 'campaign.' " Inspector Boyd checked various public sites and databases[4] to confirm Lopez's address, his eligibility to run for

---

[4] In support of the warrant, Inspector Boyd checked, among others, the following public sites: (1) Lopez's campaign website; (2) county tax records from Alameda and San Mateo; (3) CLEAR public database; (4) Alameda County Water District; (5) California Department of Motor Vehicles; (6) California Department of Social Services; (7) San Mateo County Fictious Business Name database; and (8) San Mateo County voter registration records.

public office in San Mateo County, and his campaign finance practices. He also contacted the California Fair Political Practices Commission and discovered no campaign finance disclosure forms had been submitted. As such, there was no way of knowing "how much money Lopez's campaign has raised; how the funds were spent; or if the campaign donations and expenditures are legally permissible."

## C. *Motion to Quash or Traverse the April 2014 Search Warrant*

On April 16, 2018, Lopez filed a motion to quash or traverse the April 2014 search warrant and to suppress all evidence against him. Specifically, Lopez argued: (1) there was nothing in Detective Armando's affidavit "aside from his conclusory statements and attempts to link [Lopez] to a conspiracy"; (2) there was no corroboration or indication that the "Juan" is Lopez; (3) there was no corroboration that Lopez was at 1050 Mission Road at the time the phone call was made; and (4) Detective Armando "knowingly and intentionally, or with reckless disregard for the truth," included false statements in the warrant affidavit.

Lopez argued that all evidence presented against him—including that in support of the mortgage fraud and conspiracy counts—was ultimately derived from the April 2014 search warrant as stated in the July 2014 search warrant because it was only discovered as a result of the collection and review of the original April 2014 cell phone records. Accordingly, Lopez argued that all evidence brought against him must be suppressed as "fruit of the poisonous tree."

On May 1, 2018, Lopez filed a supplemental motion, arguing that Detective Armando "perjuriously alleged that [Lopez] placed a telephone call to the [jail] phone" and that the "egregious nature" of his "false statements and mischaracterizations" fell outside the good faith exception. Lopez

9

postulated that "the most suspicious call" was actually made by Detective Armando, and that Detective Armando intentionally included this "false allegation to mislead" the judge and induce him to sign the warrant.

In opposition, the People argued there was probable cause to support the issuance of the April 2014 search warrant, or, in the alternative, the *Leon* good faith exception applied.

## D. *Initial Hearing*

At the October 3, 2018 hearing on Lopez's motion, trial counsel reiterated "there's no probable cause" and that "nothing in the search warrant affidavit actually point[ed] to" him. Instead, Detective Armando improperly used the "search warrant as an investigatory tool against [Lopez] to see if [Lopez] is participating in a certain crime" rather than telling the magistrate that he had probable cause to believe the cell phone records would contain evidence of a crime; this was an improper use of the search warrant. Moreover, there was no basis for, or corroboration of, Detective Armando's conclusion that the "cop . . . working on the other side" was him, despite the appearance of his first name in suspicious texts and that he recently moved "to the other side." Counsel emphasized that "Juan" was a common name, that the calls to the jail phone must have been made by Detective Armando, and that the affidavit stated that execution of the warrant might exclude Lopez as a suspect, which is an improper purpose. Counsel concluded, "It's all baseless bare conclusions." Further, there was no need for Lopez's personal cell phone records if the call came from the courthouse "trunked line." Finally, no one identified "Lopez as doing anything nefarious in this case."

In response, the People explained that Detective Armando had a "strong suspicion" that execution of the warrant would disclose evidence of a

10

crime. He was aware that contraband had been brought into the jail and that an officer was involved. He knew, based on work assignments and intercepted statements, that the person involved had worked in the area of the jail where the phone was found and was now "working on the other side"—a reference to the Northern Court on "the other side" of the street from the jail and where Lopez had recently been transferred; and intercepted texts referred to "Juan," which is Lopez's first name.

The People further argued that one call to the jail phone was made from a location accessible only to deputies with a key to the jail. The warrant specified that two people were involved in bringing drugs and the phone into the jail. The call from the facility across the street was made to the jail phone before anyone knew that the phone had been confiscated, suggesting that it was the deputy involved making the call. Taken together, these facts provided the requisite probable cause. In any event, Detective Armando was forthcoming in taking what he had to a judge, he relied on the judge's determination that there was probable cause, and he was entitled to the good-faith exception.

Lopez's counsel countered that the good-faith exception was inapplicable because the affidavit was "bare bones," and so deficient that Detective Armando acted in bad faith, as the warrant was "designed . . . to mislead the magistrate."

The court stated it had concerns about the factual basis for the warrant but not that it was so lacking in probable cause that it could not be issued. It stated that the good faith exception would be important and invited further briefing on that before reaching a decision.

11

### E. *Supplemental Motion*

On October 12, 2018, Lopez filed a second supplemental motion. Lopez argued that the very overbreadth of the warrant request meant there was no probable cause for the request and at the very least that the good faith exception should not apply. Detective Armando for his stated purposes would have needed no more than a single day—December 1—for geolocation and would have no need for voicemail and stored email content. Moreover, had Detective Armando been acting in good faith he would have used the security camera footage from the county building he stated he was trying to exclude Lopez from, which he admitted he requested the day before he signed the warrant affidavit. "Presumably, had the security camera footage showed that [Lopez] was in the building, that would have been used as probable cause for the search warrant."

### F. *Follow-up Hearing*

At the October 17, 2018 follow-up hearing, Lopez's trial counsel argued the good faith exception did not apply where "a warrant is so lacking indicia of probable cause so to render . . . the reliance on it unreasonable and if it's so facially deficient that it cannot be reasonably presumed to be valid." Counsel also argued the overbreadth of the search warrant and the lack of any investigative activity whatsoever to corroborate any suspicions against Lopez showed bad faith. That was especially true because Detective Armando had the jail phone for five months before he authored this search warrant, and if he was interested in seeing who had called the phone, he would have pulled the records on the jail phone without infringing on Lopez's privacy.

Counsel asserted Detective Armando's characterization of the call from the Northern Court as being "suspicious" was misleading because he did not distinguish the "suspicious call" from one of the test calls Detective Armando,

12

himself, had made. The defense position was that Detective Armando was the source of the "suspicious call." Counsel added that Detective Armando's "suspicious call" allegation was "either perjury or incompetence." "It's either he's lying because he knows that this is one of his calls or he's just not doing his job well . . . ."

The People emphasized that Detective Armando corroborated the information he received from Officer Del Carlo by following up with a telephone services manager who confirmed that the suspicious phone call originated from the facility on the other side. The People highlighted facts supporting the warrant, including: Officer Del Carlo informed Detective Armando that others were involved in bringing contraband into the jail; Dionicio gave the jail phone to Officer Del Carlo; a picture of Dionicio's cellmate, Rodriguez, was sent from Torres's cell phone with references to "Juan" around the same time that Lopez—whose first name is Juan—worked in the pod where Rodriguez and Dionicio were housed; and Dionicio's mother mentioned a person who was moved "to the other side" around the time Lopez was moved "to the [facility on] the other side."

In response to the claim that Detective Armando acted in bad faith, the People stressed that Detective Armando "certainly was doing what he could do to advance this investigation," including examining phones from unrelated cases, reviewing phone records, and preparing additional search warrants. The People underscored that case law relied upon by Lopez was inapplicable because it involved anonymous informants, which requires corroboration; there was no anonymous informant here.

In denying the motion to quash the search warrant, the court stated it was "apparent that this warrant was a product of a long investigation" pertaining to the contraband found in cell No. 38. There was sufficient

13

evidence to establish probable cause "given the linkages between Stephanie Torres, Jaime Rodriguez, and . . . the linkage between Mr. Rodriguez being housed with Dionicio Lopez in cell 38." The court further reasoned: "The fact that the cell phone in [c]ell 38 had a call sent to it from a phone at 1050 Mission Road, which we know as the Northern courthouse where there was limited access on the day in question which was established by the warrant and, most importantly, references to Juan in Stephanie Torres'[s] cell phone." All of these factors together amounted to probable cause, and even if reasonable people might disagree, "the *Leon* good-faith exception would apply."

With respect to the *Leon* factors, the court explained there are four: "was the magistrate misled by information in the affidavit which the officer knew or should have known to be false. None of that has been presented at this time; two, did the magistrate abandon their judicial role. There's [no] evidence of that;[5] three, was the affidavit so lacking indicia [of] probable cause as to render a belief in its existence being entirely unreasonable. I don't believe so based on the factors that I have just pointed to. And was the warrant so facially deficient that an officer could not reasonably presume to be valid. Same analysis applies to factors three and four under *Leon*."

Nevertheless, the court concluded there was sufficient evidence to trigger a hearing pursuant to *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*).

---

[5] A reasonable reading of the transcript suggests the word "no" is missing in this sentence; there is no evidence or discussion about whether the magistrate abandoned their role.

### G. *Franks Hearing*

At the *Franks* hearing on March 28, 2019, Lopez presented testimony from Torres and Detective Armando.

Torres testified that Juan Lopez was not the "Juan" referenced in her texts. Lopez did not drive her anywhere and she never met him. She had "[n]o communications whatsoever" with him. She did not know Deputy Juan Lopez's name but recognized him from her visits to Rodriguez (her child's father) in jail.

Detective Armando testified that Lopez's cell phone number was never found in the jail phone. Additionally, Lopez's cell phone number was not found in Torres's cell phone. Although he agreed "Juan" was a common first name, given the close proximity of the texts to the date the jail phone was found, Detective Armando thought the references were "suspicious." Detective Armando did not investigate the unknown number in Torres's records, even though he suspected that number was connected to potentially unlawful activity. He also never asked Torres if she knew Lopez.

Among the 129 pages of cell phone record data reviewed, Detective Armando reported finding only two "Juan" references. Detective Armando's affidavit did not reference the fact that the two suspicious texts occurred on Thanksgiving Day. The affidavit also failed to mention three additional "Juan" references, to wit: (1) " 'Juan didn't leave the garage door open' "; (2) " 'In talking to Juan he said it's g-u-d to come out. No staying. Denied' "; and (3) "Anthony is downstairs with Juan. What . . . a way to start off my New Years.' "

Lopez's counsel presented evidence obtained from the jail phone; Detective Armando's two test calls did not appear in the call data. Detective Armando said when he did the first test call, the jail phone indicated a

15

missed call. He was concerned that the jail phone was having connectivity issues. When he obtained the jail phone records, he did not see his test call, but he saw a call from a county line that he did not believe was associated with his desk. Detective Armando did not know if it was possible if the call he made from his desk line could have been routed through the "trunked" county line at 1050 Mission Road.

Lopez's counsel then presented evidence obtained from the "trunked" county line, which revealed there were no outgoing calls to the jail phone on December 1, 2013. Detective Armando explained that at the time he wrote his affidavit, he did not have this information and did not seek to examine the county line's records despite his ability to do so.

Detective Armando did not interview Dionicio or his parents. He knew of no relationship between Lopez and Dionicio and Dionicio's parents.

The People argued the defense had not established any intentional misrepresentation or reckless disregard for the truth. In response, defense counsel argued that reckless disregard for the truth could be shown by a failure to investigate, which is what occurred here. Specifically, there was no effort to connect Lopez with Torres; a failure to obtain the phone records of the county line; and a failure to follow-up on Lopez's whereabouts.

In denying Lopez's request, the court explained that "no one has proven that [Detective Armando] intentionally" failed to do something. The court also "thought he was very honest and direct about explaining" why he did or did not do certain things during the investigation. The court concluded: "none of the testimony . . . rose to the level of intentional misrepresentations or reckless disregard for the truth. And . . . , if he was somewhat negligent perhaps in some of the investigatory steps he took that does not qualify to

16

quash a warrant." Accordingly, the court found there was "nothing in this warrant to excise . . . ."

## DISCUSSION

### A. *Standard of Review*

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]' [Citation.] 'Although our review of factual determinations is deferential, it is not without limit. Factual determinations must be supported by substantial evidence.' [Citation.] To satisfy the substantial evidence standard, the evidence supporting the trial court's findings must be ' "reasonable, credible, and of solid value." ' " (*People v. Ayon* (2022) 80 Cal.App.5th 926, 937.)

### B. *The Affidavit Established Probable Cause*

#### 1. *Applicable Law*

In determining whether an affidavit is supported by probable cause, the magistrate must make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238 (*Gates*).)

"On review, the search warrant affidavit is construed in a commonsense and realistic fashion" (*People v. Hernandez* (1994) 30 Cal.App.4th 919, 923), and its sufficiency must be judged on the totality of the circumstances contained therein (*People v. Andrino* (1989) 210

17

Cal.App.3d 1395, 1401). "The affidavit must establish a nexus between the criminal activities and the place to be searched. [Citation.] 'The opinions of an experienced officer may legitimately be considered by the magistrate in making the probable cause determination.' [Citation.] However, an affidavit based on mere suspicion or belief, or stating a conclusion with no supporting facts, is wholly insufficient." (*People v. Garcia* (2003) 111 Cal.App.4th 715, 721.) We consider "whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." (*People v. Kraft* (2000) 23 Cal.4th 978, 1040 (*Kraft*).)

2. *Analysis*

The affidavit established that an unauthorized cell phone and controlled substances were found in inmate Dionicio's cell at the county jail on December 1, 2013. Detective Armando raised five points in seeking to establish that Lopez's personal cell phone records were required to "either" connect Lopez to the jail phone, "or help exclude him from involvement in this criminal investigation."

First, Detective Armando noted Officer Del Carlo told Detective Acosta "there were two people involved in bringing narcotics and the cell phone into the facility."

Second, Detective Armando concluded from Detective Acosta's report that Dionicio and his mother were discussing Lopez when they referred to " 'the guy that's not there anymore, working on the other side.' " Detective Armando explained he thought this "appear[ed] to be a reference to Deputy Juan Lopez" because Lopez had been assigned to Dionicio's housing unit until November 11, 2013, "when he was moved to the jail lobby"; Lopez was later transferred to court security on January 5, 2014, two days before Dionicio's visit with his parents.

18

Third, in a letter, Dionicio refers to officers believing a "cop" brought the cell phone into the jail; however, neither Detective Armando nor Detective Acosta told Dionicio they suspected an officer. Based on this reference, Detective Armando believed Dionicio "appear[ed] to be talking about . . . Juan Lopez who had been transferred to court security."

Fourth, someone texted Torres, the girlfriend of Dionicio's former cellmate Rodriguez, and referenced a "Juan" being able to pick her up. Torres texted the unknown number back, "Juan said if he could go now? Or should I tell him to wait?"

Fifth, on the date of its discovery, the jail phone received a call at 5:55 p.m. from a trunked phone line identified as the Northern Court. Detective Armando investigated the key card access to the courthouse and determined there had been no key card access during the relevant time frame. Based on his experience, only someone with a San Mateo County Sheriff's Office key could have accessed the building and made the call.

Despite these asserted connections, Lopez contends, "[t]hroughout the whole course of [the] investigation by numerous detectives, no one mentioned appellant by name. There was no evidence whatsoever that appellant was in any way involved in bringing the contraband into the jail." Probable cause, however, does not require conclusive evidence that a search *will* uncover relevant evidence, only that " 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " (*Kraft, supra,* 23 Cal.4th at p. 1041; accord, *Gates, supra,* 462 U.S. at p. 238.) " ' "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 592; see also *People v. Carrington* (2009) 47 Cal.4th 145, 163 ["The showing required in order to establish probable cause is less than a preponderance of

19

the evidence or even a prima facie case"].)  In making this determination a magistrate may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the type of offense.  (See *Gates*, at p. 240; *People v. Sandlin* (1991) 230 Cal.App.3d 1310, 1315 ["It is not essential that there be direct evidence that such evidence will be at a particular location"].)

From the detailed 15-page affidavit, which includes reliance on reports from multiple investigating officers, law enforcement personnel were necessarily involved in the transmission of contraband into the jail.  The jail phone's concealment in an undamaged light fixture in cell No. 38 permits the reasonable inference that only a correctional officer could have possessed the specialized tool needed to remove the light fixture.  While the affidavit does not specifically state that Lopez was the officer who accessed the light fixture or gave Dionicio the tool, it is clear that, based on his training and his four-month long investigation, Detective Armando suspected Lopez's involvement. (See *People v. Garcia*, *supra*, 111 Cal.App.4th at p. 724.)  First, Lopez was working in unit 5 West, which included cell No. 38 when phone records show Rodriguez using the jail phone.  Second, given the short time between Lopez's January 5, 2014 transfer to court security across the street and Dionicio's January 7, 2014 visit with his parents, it was reasonable for Detective Armando to infer that the otherwise cryptic reference to the "guy that's not there anymore, working on the other side" was Lopez, particularly in the absence of any evidence that other correctional officers were transferred from unit 5 West to court security during the relevant time frame.

Contrary to Lopez's contention, nothing in the affidavit suggests Detective Armando was motivated by an indiscriminate "fishing expedition" at the expense of his privacy rights.  Rather, Detective Armando sought

20

information for a finite period of time consistent with the information detailed in the affidavit in which to either confirm or dispel Lopez's involvement in the criminal activity under investigation.

Based on Detective Armando's narrated sequence of events, which includes the names of the inmates involved and the dates they were housed in cell No. 38 within unit 5 West, the undamaged location of the jail phone's concealment, and Lopez's work assignments with overlapping dates, locations, and secure access, it was reasonably probable for the magistrate to conclude Lopez was involved. (*Kraft, supra*, 23 Cal.4th at p. 1040.)

Three inmates had been housed in cell No. 38 during the November/December time period when, per the affidavit and recovered jail phone records, the jail phone was in use. Dionicio was housed in cell No. 38 from November 2012 through the December 2013 discovery of the jail phone; Rodriguez was housed in cell No. 38 between June 2013 and November 18, 2013; Serrano moved into cell No. 38 on November 20, 2013. Notably overlapping with Dionicio and Rodriguez, Lopez had been assigned to housing unit 5 West during this same time period[6] and until November 11, 2013. Lopez was then reassigned to work in the jail lobby until January 5, 2014, when he was transferred to work in the San Mateo County Sheriff's Office Court Security Unit "on the other side" of the street across from the jail.

---

[6] Although the start of Lopez's assignment to unit 5 West is not specified in the affidavit, the reference to it being Lopez's "regular assignment" suggests he had worked there for some time prior to his November 11 transfer to the jail lobby and his January 5 transfer to "the other side." The reasonableness of this inference was later supported by Torres's testimony that she recognized Lopez from her time visiting Rodriguez when he was in custody in unit 5 West.

21

This timing overlap also supports the warrant's expanded duration from August 17, 2013, through April 24, 2014, as do additional articulated facts that further connect Lopez to the jail phone: (1) Lopez's transfer to "the other side" immediately preceding Dionicio's mother's surreptitious reference to "the one that's not there anymore"; (2) the December 1, 2013 call to the jail phone from a trunked line originating at the Northern Court—located across the street from the jail lobby where Lopez then-worked—could only have been made by someone with a sheriff's key; and (3) the first name of Juan— matching Lopez's first name—appearing in two November 2013 text messages from the cell phone belonging to the girlfriend of cell No. 38 inmate Rodriguez, the same phone that was also used to text the jail phone in November 2013; and (4) Dionicio's April 8, 2014 letter reference to "a cop" being involved.

Considering these articulated connections between Lopez and cell No. 38 and its inmates and their use of the jail phone—including calls and messages to and from Torres—it was reasonable for Detective Armando to further connect the investigative trail to Lopez and his similarly timed transfer to "the other side" and for the magistrate to conclude Lopez was involved. While Lopez questions the need to search his *personal* cell phone, the affidavit notes deliberate efforts to conceal or obfuscate that require expanded investigation, such as the destruction of identifying information contained within the jail phone and its SIM card, the use of a trunked phone line, the surreptitious references between Dionicio and his parents, and Torres's texts about "Juan." Moreover, recognizing today's technologically mobile society, it is reasonable to infer that Lopez carried a personal cell phone, which would have been reasonably likely to possess evidence of his involvement with the jail contraband. (See *People v. Meza* (2023)

22

90 Cal.App.5th 520, 536 [reasonable for magistrate to conclude perpetrators were carrying cell phones the morning of the murder and used them in coordinating their movements]; *Riley v. California* (2014) 573 U.S. 373, 385 [cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy"; "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises"]; *United States v. James* (8th Cir. 2021) 3 F.4th 1102, 1105 [finding probable cause supported warrant for cell phone records "[e]ven if nobody knew for sure whether the robber *actually* possessed a cell phone, the judges were not required to check their common sense at the door and ignore the fact that most people 'compulsively carry cell phones with them all the time' "].)

In sum, we conclude the magistrate had a substantial basis for concluding there was a reasonable probability that Lopez was involved in bringing the contraband into the jail or concealing that contraband and that evidence about the contraband would likely be found on his personal cell phone. (*Kraft*, *supra*, 23 Cal.4th at p. 1040.) Accordingly, probable cause supported issuance of the search warrant.

## C. *The Good Faith Exception*

Even if the affidavit had not established probable cause, the evidence seized from Lopez's cell phone pursuant to the search warrant need not be excluded, because the officers relied on the warrant in good faith. (*Leon, supra*, 468 U.S. at p. 922.)

A search conducted pursuant to a warrant is presumably conducted in good faith. (*Leon, supra*, 468 U.S. at p. 922.) Nevertheless, the officer's reliance on the magistrate's probable cause determination must be objectively reasonable—in other words, there can be no finding of good faith if a

23

reasonably well-trained officer would have known the search was illegal despite the magistrate's authorization. (*Id.* at pp. 922–923 & fn. 23.) Lopez asserts that the good faith exception does not apply because the affidavit in support of the search warrant was so lacking sufficient indicia of probable cause that Detective Armando could not have reasonably believed it was valid.

The record, however, supports the conclusion that a reasonably well-trained officer in Detective Armando's position would not have known his affidavit failed to establish probable cause. (*Leon, supra*, 468 U.S. at p. 923, see also *People v. Camarella* (1991) 54 Cal.3d 592, 596.) The affidavit reflects that Detective Armando conducted an extended four-month investigation— that was still ongoing at the time the warrant was sought—before seeking judicial authority to obtain Lopez's cell phone records. After retrieval of the jail phone, Detective Armando conducted a full data extraction, during which he discovered several calls from the jail phone went to a number later determined to belong to Torres, the girlfriend of an inmate previously housed in cell No. 38. Detective Armando obtained a search warrant for Torres's cell phone, resulting in the production of 129 pages of records, which in turn revealed the texts from November 28, 2013, that referenced a "Juan."

As part of his investigation, Detective Armando also checked the card key access records to determine who had been in the Northern Court on December 1, 2013. Based on his review of the security log, Detective Armando knew two employees had been in the building on December 1, but left several hours before the time of the call to the jail phone. As the records showed no further key card access after the employees left, it was objectively reasonable for Detective Armando to believe that only someone within the San Mateo County Sheriff's Office could have accessed the building through

24

their separately keyed side entrance, just as it was reasonable to infer that only correctional personnel could have accessed the light or provided the tool to access the light where the jail phone had been hidden. Considering the additional articulated connections between Lopez and cell No. 38 and its inmates, it was reasonable to further connect the investigative trail to Lopez and his similarly timed transfer to "the other side." That Detective Armando also obtained a search warrant to recover the security footage from December 1 further demonstrates his good faith diligence; the fact that the footage had not been produced in advance of the April 2014 search warrant application does not make the investigation unreasonable.

On this record, we cannot conclude a well-trained officer should reasonably have known that the affidavit failed to establish probable cause such that a search warrant should not have been requested. (See *Leon*, *supra*, 468 U.S. at p. 924; *People v. Camarella*, *supra*, 54 Cal.3d at p. 596.) Because Detective Armando's belief that the affidavit presented probable cause to search Lopez's cell phone records was not objectively unreasonable, the *Leon* exception to the exclusionary rule applies, and the motion to quash was properly denied.[7]

## DISPOSITION

The judgment is affirmed.

---

[7] By reason of this holding, there is no need to address Lopez's argument that all of the evidence obtained from the subsequent July 2014 search warrant should be excluded as fruit of the poisonous tree.

25

_____
DESAUTELS, J.

We concur:


_____
STEWART, P. J.


_____
MILLER, J.

*People v. Lopez* (A166940)

26